### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ———————————————— ) | |
| MARSHA W. YEE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 21-1185 (ABJ) |
| ) | |
| MERRICK B. GARLAND, ) | |
| *Attorney General* ) | |
| *of the United States*, ) | |
| ) | |
| Defendant. ) | |
| ———————————————— ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Marsha W. Yee is an Assistant United States Attorney ("AUSA") in the United States Attorney's Office for the District of Columbia.  Compl. [Dkt. # 1] ¶ 1.  She "alleges that the Department discriminated against her and continues to discriminate against her based on her race (Asian), sex (female), age (more than 40 years old) and/or prior protected activity."  Compl. ¶ 2. On August 13, 2021, defendant moved to dismiss her complaint, or in the alternative, for summary judgment.  *See* Def.'s Mot. to Dismiss or, Alternatively, for Summ. J. [Dkt. # 7] (SEALED) ("Def.'s Mot.").  Plaintiff opposed the motion and moved pursuant to Fed. R. Civ. Proc. 56(d) to conduct discovery in advance of any ruling on the summary judgment motion.  *See* Pl.'s Rule 56(d) Mot. and Opp. to Def.'s Mot. [Dkt. # 9] ("Pl.'s Opp.").  The motions are now fully briefed.  *See* Reply Mem. in Supp. of Def.'s Mot. and Opp. to Pl.'s Opp. [Dkt. # 11] ("Def.'s Reply"); Reply in Further Supp. of Pl.'s Opp. [Dkt. # 14] ("Pl.'s Surreply").

The Court will **GRANT** defendant's motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and for lack of jurisdiction under Rule 12(b)(1).

Plaintiff's claims concerning disparate treatment in the assignment of cases throughout her tenure in the Office do not allege the adverse action necessary to an actionable claim of discrimination or retaliation under Title VII or the ADEA, and plaintiff's allegations regarding the disciplinary action taken against her in 2020 do not allege sufficient facts to state a plausible claim that the action was either retaliatory or discriminatory. The Court also does not have jurisdiction over plaintiff's due process claim. In light of those rulings, it is not necessary to reach the arguments concerning Rule 56.

## BACKGROUND

"Plaintiff has served as an AUSA since early 2016." Compl. ¶ 9. She alleges that she "is the only female and only non-white person in the group of five AUSAs who started working in the same division during the same period," and that she "was and is the only Asian female AUSA in her division." Compl. ¶¶ 10–11. In her opposition, plaintiff puts it more bluntly: "Plaintiff, an Asian female, was the token diversity hire in a sea of white men." Pl.'s Opp. at 1.

Plaintiff alleges that "from the outset of her employment as an AUSA and continuing, management officials have assigned her more cases and/or more high-work cases with respect to case transfers and new cases." Compl. ¶ 13. She states, "[u]pon information and belief," that on or about her first day as an AUSA, "a specific management official approved more high-work cases for transfer to plaintiff than to the two white male attorneys who shared the same start date." Compl. ¶ 14. The complaint does not state whether the lawyers hired at the same time had comparable levels of prior experience. The same official allegedly made decisions about case transfers and new case assignments "through the end of December 2020," Compl. ¶ 16, while "a different management official" has been making those decisions since January 1, 2021. Compl. ¶ 17.

Plaintiff reports that her workplace "is the first and only work environment where plaintiff has heard another employee use the word 'Chink.'"  Compl. ¶ 18.  Though plaintiff does not specify when this occurred, who made the comment, or in what context, she states that the employee who used the term was "a management official."  Compl. ¶ 18.  She adds that "then-President Donald J. Trump's racist language, including 'China virus,' 'Chinese virus' and 'Kung flu,' fostered an environment that condones racism against Asians."  Compl. ¶ 19.

Plaintiff alleges that she first engaged in protected activity around June or July 2016, when she "raised concerns about, among other things, (i) an agency's unfair treatment of plaintiff, likely due to plaintiff's race and/or sex, and (ii) disparate case assignments for that agency's cases."  Compl. ¶ 20.  She does not elaborate upon the nature of the alleged unfair treatment by the unnamed federal agency at that time, nor does she specify how the concerns about either issue were "raised" or to whom.  Plaintiff alleges that she again "engaged in protected activity around March 2017, when she prepared and provided an affidavit to an Equal Employment Opportunity ("EEO") investigator in connection with an agency counsel's complaint that his agency had discriminated against him in terminating his employment."  Compl. ¶ 21.

### Plaintiff's Disciplinary Proceedings

On February 7, 2018, plaintiff – who was then serving as defense counsel in *Democracy Forward Foundation v. U.S. Department of Health and Human Services*, No. 17-2449 – filed a document with the U.S. District Court for the District of Columbia that was labeled a "joint" report and included a signature block bearing the electronic signature of opposing counsel.  Compl. ¶ 25; *see also* Joint Status Report [17-2449 Dkt. # 9].[1]  The opposing counsel immediately filed a

---

1    Documents on the docket in *Democracy Forward Found. v. U.S. Dep't of Health & Hum. Servs.*, No. 17-2449, will be referred to by including the case number before the docket number.

response to the status report, announcing that she needed to take "the unusual step of filing this

response to clarify the record," because "counsel for HHS did not have permission to file the report

on Plaintiff's behalf."  Pl.'s Resp. to Joint Proposed Status Report [17-2449 Dkt. # 10].[2]

> At 7:09 p.m. this evening, Defendant's counsel sent the undersigned proposed language for inclusion in the joint status report that set forth Defendant's position opposing Plaintiff's request that the parties file interim joint status reports.  Defendant's counsel stated that she would file the status report as one on behalf of both parties if Plaintiff's counsel did not respond by 8:00 p.m.  Prior to then, Plaintiff's counsel responded, indicating that Plaintiff wished for its position to also be reflected in the joint status report – namely that interim status reports were reasonable under the circumstances – and that she did not authorize Defendant's counsel to file any report that omitted Plaintiff's position.  Defendant's counsel responded, stating that, unless Plaintiff withdrew its request for interim status reports, she would file the status report omitting Plaintiff's position.  Plaintiff's counsel once again objected to filing of the report in that condition, stating its preference to write separately to apprise the Court of its position.  Defendant's counsel filed a document at approximately 8:40 p.m. this evening titled "Joint Status Report" that included Plaintiff's counsel's signature block and electronic signature.  The document filed by Defendant's counsel *did not* contain Plaintiff's response to Defendant's opposition to the filing of interim status reports and was filed without Plaintiff's authorization.  Accordingly, Plaintiff submits the response below to the final two paragraphs included in the report filed this evening by Defendant's counsel.

---

2      In the Court's view, both the "joint" report docketed by plaintiff on February 7, 2018, and the "supervisor-approved notice" she filed "to correct the record," are incorporated in the complaint in paragraphs 25 and 26.  As for the response docketed by opposing counsel, while a Court ordinarily may not consider documents that are not attached as exhibits or incorporated by reference in the complaint, it may consider documents subject to judicial notice.  *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  "A federal court may take judicial notice of 'a fact that is not subject to reasonable dispute' if it either 'is generally known within the trial court's territorial jurisdiction' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"  *Hurd v. D.C., Gov't*, 864 F.3d 671, 686 (D.C. Cir. 2017), quoting Fed. R. Evid. 201(b).  This includes "court records from other cases," *id.*, so long as the court is relying on a court record for "'what was said' without relying 'on it for the truth of the matter asserted.'"  *Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018), quoting *Hurd*, 864 F.3d at 686.  Here, the Court is relying on pleadings on the *Democracy Forward* docket only for the fact of what they said.

*Id.* at 2–3 (emphasis in original).

Plaintiff Yee filed a correction with the court in her role as counsel for HHS on February 12, 2018.  Compl. ¶ 26.  The correction stated:

> Defendant respectfully submits this notice to correct the record regarding the Joint Proposed Schedule that was filed on February 7, 2018, as ECF No. 9.  That filing incorrectly indicated that the filing was a "joint" filing and incorrectly included the signature block for Plaintiff's counsel.  The undersigned apologizes for these errors and for any inconvenience.

Def.'s Not. Regarding Joint Proposed Schedule [17-2449 Dkt. # 11].

The Office of Professional Responsibility ("OPR") opened an investigation into the circumstances surrounding the original filing.  Compl. ¶ 27.  It issued a draft report of investigation, to which plaintiff had an opportunity to respond, Compl. ¶ 28, and it issued a final report of investigation on September 26, 2019.[3]  The Professional Misconduct Review Unit ("PRMU") conducted its own *de novo* review of the allegations, and on November 7, 2019, an attorney from the Unit recommended a ten-day suspension for plaintiff's "Lack of Candor" and "Conduct Unbecoming an Assistant United States Attorney."  *See* Disciplinary Proposal at 1, 6, 7.  Plaintiff responded to the proposal, *see* Pl.'s Resp., and after reviewing the underlying documents, the November 7 recommendation, and plaintiff's response, the Chief of the PRMU, Mark Masling, imposed a five-day suspension without pay in a letter dated January 21, 2020.  *See* Letter from

---

3      The complaint does not offer details about these documents, but they are clearly incorporated into the complaint.  *See, e.g.*, Compl. ¶¶ 27–34.  The government attached the November 7 Disciplinary Proposal as Exhibit 4/C to its motion, *see* Letter from Prof'l Misconduct Review Unit, U.S. Dep't of Just., to Marsha Yee (Nov. 7, 2019), Ex. 4/C to Def.'s Mot [Dkt. # 7-2] (SEALED) ("Disciplinary Proposal"), and plaintiff's Response is Exhibit 5/D.  *See* Letter from Marsha Yee to Mark Masling, Prof'l Misconduct Review Unit Chief, U.S. Dep't of Just. (Dec. 10, 2019), Ex. 5/D to Def.'s Mot. [Dkt. # 7-2] (SEALED) ("Pl.'s Resp.").  Neither the September 26 Final Report of Investigation nor the letters the Professional Misconduct Review Unit received from then-United States Attorney Jessie Liu have been provided to the Court, but they are described in the other documents.

Mark Masling, Prof'l Misconduct Review Unit Chief, U.S. Dep't of Just., to Marsha Yee

(Jan. 21, 2020), Ex. 6/E to Def.'s Mot. [Dkt. # 7-2] (SEALED) ("Disciplinary Decision") at 1.

The Disciplinary Decision concluded:

> Based on my de novo review and evaluation of those materials, as well as
> my analysis of the relevant legal and ethical standards, I sustain the charge
> of Lack of Candor, and do not sustain the charge of Conduct Unbecoming
> an Assistant United States Attorney.  I have reduced the proposal to suspend
> you without pay from your position of Assistant United States Attorney for
> a period of ten days to a period of five days.  I authorize OPR to refer its
> ROI [Report of Investigation], this letter, and whatever other materials OPR
> thinks relevant to the New York and California state bars, where you are
> licensed to practice law, as I conclude that your lack of candor implicates
> District of Columbia Rule of Professional Conduct 8.4(c).

Disciplinary Decision at 2.  Plaintiff filed a grievance objecting to the sanction, and she asserts

that the Disciplinary Decision "became final . . . when the Associate Deputy Attorney General, as

the grievance official, denied plaintiff's grievance."  Compl. ¶ 4.

Plaintiff alleges in her complaint that the OPR report "is intellectually dishonest" and that

it contains "a misrepresentation . . . about a specific case."  Compl. ¶ 29.  She adds that the ensuing

Disciplinary Proposal and Decision were also "intellectually dishonest," and she maintains that the

grievance decision was "intellectually dishonest," as well.  Compl. ¶¶ 30, 32.

### Plaintiff's Equal Opportunity Advocacy

On March 23, 2020, plaintiff made contact with an Equal Employment Opportunity

counselor.  Compl. ¶ 39.  "On May 4, 2020, plaintiff submitted a formal EEO complaint."

Compl. ¶ 43.[4]  Plaintiff alleges "[u]pon information and belief" that the entity that processed her

complaint, the Executive Office for United States Attorneys ("EOUSA"), "was not the correct or

---

4    Plaintiff includes her EEO complaint as an exhibit to her opposition.  *See* Addendum to
Compl. of Discrimination, Ex. A to Pl.'s Opp. [Dkt. # 9-1] ("EEO Compl.").

most appropriate component to accept, process and/or investigate plaintiff's allegations."  Compl. ¶¶ 40–41.  She also accuses EOUSA of "shirking its responsibility to conduct an adequate investigation of plaintiff's allegations."  Compl. ¶ 44.  EOUSA sent plaintiff a letter on August 10, 2020 "that largely dismissed plaintiff's claims and assigned an investigator to investigate one accepted claim."  Compl. ¶ 47.  Among the dismissed claims was "plaintiff's claim for disparate case assignments."  Compl. ¶ 49.  "On November 2, 2020, EOUSA provided its report of investigation.  On November 2, 2020, plaintiff requested a final agency decision.  On January 28, 2021, the Department Complaint Adjudication Office issued a final agency decision."  Compl. ¶¶ 55–57.

### **The Complaint**

The complaint in this case consists of four counts.

Count I alleges that defendant violated Title VII,  42 U.S.C. § 2000e-16, when it took "one or more of the following tangible adverse employment actions" against her "because of . . . plaintiff's race and/or sex":  (1) "imposed a five-day suspension, without pay"; (2) "denied plaintiff's grievance"; and (3) "assigned plaintiff more cases and/or more high-work cases."  Compl. ¶ 61.

Count II alleges that defendant violated the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, by taking the same three adverse employment actions because of her age.  Compl. ¶ 65.

There is no Count III.

Count IV alleges that the January 21, 2020 Disciplinary Decision and the denial of plaintiff's grievance were issued in retaliation for "plaintiff's December 10, 2019, response to the disciplinary proposal," in violation of Title VII.  Compl. ¶ 69.  Plaintiff characterizes her response

to the proposed discipline as "prior protected activity" because in it, she "expressed opposition to a practice made unlawful by Title VII, namely that a high-ranking agency counsel in a subcomponent of the Department treated plaintiff differently based on her sex, including foisting onto plaintiff work that should have been completed by one of his subordinates."  Compl. ¶ 69. Count IV further alleges that plaintiff has continued to engage in protected activity since then, "including making initial contact with an EEO counselor on March 23, 2020, subsequent communications with an EEO counselor, submitting a formal complaint on May 4, 2020," and generally participating in the EEO process, Compl. ¶ 70, and that her high case load is further retaliation meant to interfere with her EEO activity.  Compl. ¶ 71.

Count V alleges that "[t]he Department violated plaintiff's rights under the Fifth Amendment's Due Process Clause by changing the standard that it used to impose discipline, a standard that was not provided in its disciplinary proposal and that appeared for the first time in its disciplinary decision."  Compl. ¶ 75.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005) (applying principle to a Rule 12(b)(1) motion).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C.

Cir. 2002) (Rule 12(b)(6) case); *Food and Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (Rule 12(b)(1) case).

Where the action is brought by a *pro se* plaintiff, a district court has an obligation "to consider [her] filings as a whole before dismissing a complaint," *Schnitzler v. United States*, 761 F.3d 33, 38 (D.C. Cir. 2014), because such complaints are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972). Here, however, the *pro se* plaintiff is herself an attorney, and another court in this district has observed that a *pro se* attorney "is presumed to have a knowledge of the legal system and need less protections from the court." *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 234 (D.D.C. 2007).

### Subject Matter Jurisdiction

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *see also Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002). Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement[,] no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint."

*Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987).  Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case."  *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharms.*, *Inc. v. FDA*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005).

### Failure to State a Claim

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*:  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* at 678–79, citing *Twombly*, 550 U.S. at 555–56.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678, citing *Twombly*, 550 U.S. at 556.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*, quoting *Twombly*, 550 U.S. at 556.  A pleading must offer more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*, citing *Twombly*, 550 U.S. at 555.

When considering a motion to dismiss under Rule 12(b)(6), the Court is bound to construe a complaint liberally in the plaintiff's favor, and it should grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994), citing *Schuler*, 617 F.2d at 608.  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions.  *See id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *St. Francis Xavier Parochial Sch.*, 117 F.3d at 624–25.

## ANALYSIS

### I.     Count I

Count I alleges that defendant violated Title VII.  Under Title VII, the federal government is required to make "[a]ll personnel actions affecting employees or applicants for employment . . . free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a).[5]

At the motion to dismiss stage, "the plaintiff must establish that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006), quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999).  Because the motion

---

5     Plaintiff explains in her opposition to the motion to dismiss that she means to bring a disparate treatment, as opposed to disparate impact, case.  Pl.'s Opp. at 11.

is decided based on the face of the complaint, "an employment discrimination plaintiff need not anticipate legitimate, non-discriminatory reasons that may be proffered by the employer for the adverse employment action nor allege pretext to survive a motion to dismiss." *Easaw v. Newport*, 253 F. Supp. 3d 22, 26–27 (D.D.C. 2017).  Plaintiff need only allege facts supporting an inference that she "suffered an adverse employment action . . . because of her [protected status]." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  That being said, even in an employment case, "a formulaic recitation of the elements of a cause of action will not do," *Brown v. Sessoms*, 774 F.3d 1016, 1020 (D.C. Cir. 2014), quoting *Twombly*, 550 U.S. at 555, and plaintiff must identify factual allegations that at least show a "nexus between defendants' alleged discriminatory motive and the adverse action." *Easaw*, 253 F. Supp. 3d at 30.[6]

A critical element of any Title VII claim, then, is the adverse action.  An adverse employment action is a "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  To establish an adverse employment action, a plaintiff must show that she "experience[d] materially

---

6      At one point, the D.C. Circuit formulated this standard more permissively, stating that "complaints need not plead law or match facts to every element of a legal theory," so plaintiffs need not "make out a prima facie case of discrimination," and "'I was turned down for a job because of my race' is all a complaint has to say." *Sparrow*, 216 F.3d at 1115 (brackets and internal quotation marks omitted).  However, this Court agrees with the others in this district that have persuasively concluded that *Sparrow* was abrogated by *Iqbal* and *Twombly*.  *See Easaw*, 253 F. Supp. 3d at 29 n.4 ("[T]he undersigned joins the chorus of Judges of this Court who have held that *Sparrow* is no longer binding authority after *Twombly* and *Iqbal*."); *McManus v. Kelly*, 246 F. Supp. 3d 103, 111 (D.D.C. 2017) ("[A]lthough the issue is not entirely settled, the Court is convinced that the *Sparrow* pleading standard is no longer controlling."); *Jackson v. Acedo*, No. 08-1941, 2009 WL 2619446, at *4 (D.D.C. Aug. 26, 2009) ("The Court . . . concludes that *Sparrow* is no longer binding authority in light of these observations by the Supreme Court in *Twombly*.").

adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002). This harm is usually in the form of "direct economic harm," *Burlington Indus.*, 524 U.S. at 762, such as affecting an employee's grade or salary. *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003).

It is undisputed that plaintiff belongs to a protected class, so that element has been alleged. Plaintiff asserts that her employer has taken three adverse actions against her: (1) assigning plaintiff more cases and/or more high-work cases; (2) the five-day disciplinary suspension; and (3) the denial of plaintiff's grievance. Compl. ¶ 61.

With respect to the first challenged action, plaintiff candidly acknowledges in the complaint that "[d]isparate case assignments generally do not qualify as a materially adverse action for the purposes of a discrimination claim." Compl. ¶ 22; *see Koch v. Schapiro*, 759 F. Supp. 2d 67, 75 (D.D.C. 2011) ("The fact that a plaintiff has more work on occasion than another does not give rise to a materially adverse action."), *aff'd sub nom.*, *Koch v. White*, No. 14-5101, 2016 WL 1275025 (D.C. Cir. Feb. 8, 2016). Plaintiff asserts, without citation, that her heavy workload became actionable when she was suspended, Compl. ¶ 23; *see also* Pl.'s Opp. at 16–19, but that is a legal conclusion and not a fact, and it merely bolsters the conclusion that the suspension, which does meet the requirement of an alleged adverse action, is the employment action at issue. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 72–73 (2006) (holding that whether a suspension without pay was an adverse employment action was a jury question).

Since the allegations concerning the assignment of cases do not allege an adverse employment action, they fail to state a claim under Title VII, and the Court will move on to the allegations concerning the suspension. The question for purposes of the motion to dismiss is

whether plaintiff has pled sufficient facts to give rise to a plausible inference that the suspension was connected to, or motivated by, her race or her sex.

Plaintiff makes general allegations in the introductory section of her complaint that she was treated differently than the white, male colleagues she describes as comparators.  But she alleges that the different treatment took the form of case assignments.  *See* Compl. ¶¶ 12–15.

When plaintiff turns to the subject of the suspension, she alleges that the incident that led to the initiation of the OPR process "occurred the night of February 7, 2018, when plaintiff neglected to remove the word 'joint' from the title and to remove the signature block of opposing counsel before filing" a status report.  Compl. ¶ 25.  She lists the opportunities she had during the process to provide information to OPR, *see* Compl. ¶ 28, and she insists that the report of investigation, the Disciplinary Proposal, and the Disciplinary Decision, were all "intellectually dishonest."  Compl. ¶¶ 29–30.  She suggests that the investigation was rushed, and that she had inadequate time to respond to OPR's inquiries.  Compl. ¶¶ 51–55.  But she does not offer any facts supporting an inference that the investigator or the disciplinary decisionmakers harbored any discriminatory animus against her.  In sum, Count I is entirely conclusory; it simply asserts without reciting any underlying facts that the adverse employment actions were taken "because of, in whole or in part, plaintiff's race and/or sex."  Compl. ¶ 61.

Plaintiff attempts to cure this omission by making reference to a legal doctrine that could hypothetically apply:

> Plaintiff asserts the "cat's paw" theory, under which the Department *may* be held liable *if* the United States Attorney and/or anyone in the USAO who drafted or otherwise contributed to the United States Attorney's letter to the proposing official had an improper bias and *if* anyone in the Department who provided input to the proposing official and/or the deciding official had an improper bias.

Compl. ¶ 31 (emphasis added); *see also* Pl.'s Opp. at 18, citing Compl. ¶ 31 ("Defendant's argument about 'different decision-makers' for the disparate case assignments and the discipline-based claims is . . . flawed because it ignores that plaintiff's complaint asserted the cat's paw theory.") (citation omitted).  Plaintiff may have asserted a theory, but for purposes of *Iqbal* and *Twombly,* legal conclusions and theories need not be accepted on their face; what counts at this stage are *facts*, and there are none of those in the complaint when it comes to the suspension.

It is true that under the cat's paw theory, "a formal decision maker may be an unwitting conduit of another actor's illicit motives."  *Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015).  But in order to "prevail on such a theory," plaintiff must show that "(1) a supervisor perform[ed] an act motivated by discriminatory animus, (2) that [the act was] intended by the supervisor to cause an adverse employment action, and (3) that act [was] a proximate cause of the ultimate employment action."  *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 297 (D.C. Cir. 2015).  Even accepting plaintiff's rather insubstantial allegations that case assignments were distributed with discriminatory animus, plaintiff has not alleged that the one case management official, who "upon information and belief" was making all of the allegedly unfair case assignments weighed in on the disciplinary process, much less that that individual did so with the intent to prompt the adverse action.  Nor is there any allegation that the input from that supervisor influenced the Disciplinary Proposal or the Disciplinary Decision in any way.  Merely inserting the words "cat's paw" in a complaint does not give rise to a plausible inference of cat's paw liability.

Plaintiff makes two other allegations that implicate her race, but again, both are unconnected with her suspension.  First, she states that she "has heard another employee use the word 'Chink.'"  Compl. ¶ 18.  But not only is that allegation undated, plaintiff does not specify

who made it beyond stating that it was "a management official."  Compl. ¶ 18.  So the complaint

fails to connect the person who used the term with any of the processes described, and there is no

basis to infer that the use of the derogatory term is somehow connected with the adverse

employment action.  Second, she states that "then-President Donald J. Trump's racist language,

including 'China virus,' 'Chinese virus' and 'Kung flu,' fostered an environment that condones

racism against Asians or, perhaps more accurately, individuals who are or appear to be East Asian."

Compl. ¶ 19.  While the former President's statements were inexcusable, the plaintiff has made no

effort to tie them to the "environment" within her place of employment or to the adverse actions

at issue in the case.  For all of these reasons, the complaint does not state a claim that plaintiff's

suspension was based on her race or sex in violation of Title VII.[7]

That leads us to the denial of plaintiff's grievance.  Plaintiff takes the clear position that

the denial of her grievance merely made her suspension final.  *See* Compl. ¶ 4 ("On March 20,

2020, the Department's disciplinary decision became final within the Department when the

Associate Deputy Attorney General, as the grievance official, denied plaintiff's grievance.").  So

the denial of the grievance does not supply an independent basis for relief, because the ruling on

the grievance denial simply allowed the actual adverse employment action to go into effect.  And

even if the decision denying the grievance was properly alleged to be an independent decision with

---

[7]     Plaintiff also argues that her claim that the decisions and recommendations were
"intellectually dishonest" lends itself to an inference of pretext.  *See* Pl.'s Opp. at 20.  But the mere
fact that plaintiff disagrees with the decision, or that she claims, in an entirely summary fashion,
that it was unsupportable, does not by itself add factual support to the allegation that it was
discriminatorily motivated.  In any event, the burden does not shift to plaintiff to demonstrate that
the employer's stated legitimate, non-discriminatory reason was merely pretextual until the Court
is applying the *McDonnell-Douglas* test at the summary judgment stage, *Brown*, 774 F.3d at 1023,
and in this opinion, the Court is finding the complaint so deficient on its face that it is not taking
up the summary judgment motion.

its own consequences, as was the case with the Disciplinary Decision, there are no allegations in the complaint that support an inference that the decisionmaker harbored any bias against plaintiff based on her race or sex, or that the decision was intentionally tainted by a recommendation that flowed upwards from a biased supervisor below.

Therefore, the motion to dismiss will be granted with respect to Count I.

## II.    <u>Count II</u>

Count II alleges that defendant violated the ADEA.  The standard for surviving a motion to dismiss under the ADEA is the same as the standard under Title VII.  *See Baloch*, 550 F.3d at 1196 ("Under Title VII [and] the ADEA . . . the [] essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability.").  Plaintiff asserts the same three "tangible adverse employment actions" were taken "because of . . . plaintiff's age":  (1) the disparate case assignments; (2) the five-day suspension; and (3) the denial of her grievance.  Compl. ¶ 65.

For the same reasons set forth with respect to Count I, the allegations concerning disparate case assignments and the denial of plaintiff's grievance do not suffice to identify actionable adverse employment actions, and those portions of Count II must be dismissed.  And for the same reasons stated in Count I, plaintiff has not pled a single fact that would give rise to a plausible inference that her suspension was motivated in any way by her age.  As a result, the motion will be granted with respect to Count II.

## III.   <u>Count IV</u>

Count IV alleges that plaintiff was suspended and her grievance was denied in retaliation for her "prior protected activity":

17

> [P]laintiff's December 10, 2019, response to the disciplinary proposal in which plaintiff expressed opposition to a practice made unlawful by Title VII, namely that a high-ranking agency counsel in a subcomponent of the Department treated plaintiff differently based on her sex, including foisting onto plaintiff work that should have been completed by one of his subordinates.

Compl. ¶ 69.

She adds:

> Plaintiff has continued to engage in protected activity, including making initial contact with an EEO counselor on March 23, 2020, subsequent communications with an EEO counselor, submitting a formal complaint on May 4, 2020, reviewing the EEO counselor's report and attachments, reviewing and responding to multiple requests for additional information and a document request during the period leading up to the Department's November 2, 2020, report of investigation, requesting a final agency decision, reviewing the agency's statement in opposition and the final agency decision, and initiating and pursing this action.

Compl. ¶ 70.

The adverse employment actions alleged in this count are that defendant:

> (i) imposed a five-day suspension, without pay, (ii) denied plaintiff's grievance and (iii) assigned plaintiff more cases and/or more high-work cases (a) to impair her defense in responding to [the] OPR inquiry, investigation and draft report, the PMRU disciplinary proposal, and the New York and California bars, (b) to impair her in pursuing a grievance and (c) to deter her from pursuing her EEO claims.

Compl. ¶ 71.

Title VII's anti-retaliation provision makes it unlawful for "an employer [to] 'discriminat[e] against' an employee . . . because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N.*, 548 U.S. at 56, quoting 42 U.S.C. § 2000e–3(a); *see also Baird v. Gotbaum*, 792 F.3d 166, 168 n.1 (D.C. Cir. 2015) (confirming that the general ban on retaliation in section 2000e–3(a) applies to federal employers through section 2000e–16). The

first clause, regarding employees who oppose a practice made unlawful by Title VII, is known as the opposition clause, while the second clause, regarding employees who participate in an EEO investigation, proceeding, or hearing is known as the participation clause. *See Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 274 (2009).

In order to establish a prima facie case of retaliation, plaintiff "must show (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two." *Small*, 350 F.3d at 1292. However, a "plaintiff alleging retaliation faces a low hurdle at the motion to dismiss stage." *Winston v. Clough*, 712 F.Supp.2d 1, 11 (D.D.C. 2010).

The elements of a retaliation claim differ from what must be shown in support of a discrimination claim; while the causal connection must be stronger, the threshold for what constitutes an adverse action is somewhat lower. While a plaintiff alleging discrimination need only show that the action was motivated by unlawful bias, *Burley*, 801 F.3d at 297, the Supreme Court has emphasized that "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). However, "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Burlington N.*, 548 U.S. at 67; *see also Bridgeforth v. Jewell*, 721 F.3d 661, 663 n.* (D.C. Cir. 2013) (explaining that retaliation "encompass[es] a broader sweep of actions" than wrongful discrimination). Adverse employment actions in the retaliation context need only "be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 57.

Notwithstanding these differences, to be actionable, a workplace event must still have consequences:  "[w]e speak of *material* adversity because we believe it is important to separate significant from trivial harms.  Title VII, we have said, does not set forth 'a general civility code for the American workplace.'"  *Burlington N.*, 548 U.S. at 68 (emphasis in original), quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).  The plaintiff still must suffer some objectively tangible harm.  *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007); *Forkkio*, 306 F.3d at 1130–32 (explaining that purely subjective injuries, such as dissatisfaction with a reassignment, public humiliation, or loss of reputation are not adverse actions, while reassignment with significantly different responsibilities or a significant change in benefits generally indicates an adverse action; holding that the assignment of the plaintiff's supervisor "may have caused [plaintiff] subjective injury, but it did not objectively harm his working conditions or future employment prospects" to support a retaliation claim).

Finally, the D.C. Circuit has explained that when a plaintiff is alleging retaliation in response to "protected activity," "[n]ot every complaint garners its author protection under Title VII.  While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition."  *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) (internal citations omitted) (opining that a memorandum the plaintiff sent to her supervisors and the EEO office may not have met this standard because it "did not allege . . . that she was currently being discriminated against or that she was being retaliated against for her previous lawsuit").  "[A]n employee seeking the protection of the opposition clause must demonstrate  a good faith, reasonable belief that  the  challenged  practice  violates Title VII." *George v. Leavitt*, 407 F.3d 405, 417 (D.C. Cir. 2005) (citation and brackets omitted).

With respect to the portion of the claim that alleges that the assignment of hard cases to the plaintiff was retaliatory, the complaint is devoid of allegations of objectively tangible harm, and it does not contain facts to support an inference that assignment of cases was adverse for purposes of the standard in this circuit, so the retaliation claim fails on that basis alone.

Moreover, the retaliation count is entirely conclusory with regard to the distribution of cases; it simply recites that "[d]efendant took one or more of the following tangible adverse employment actions for the purposes of a retaliation claim because of plaintiff's prior protected activity." Compl. ¶ 71.  The complaint itself highlights plaintiff's inability to support a plausible inference that her response to the Disciplinary Proposal in 2019 was the "but for" cause of the allegedly disproportionately burdensome workload:  plaintiff specifically alleges that she was hired in early 2016, and that "from the outset of her employment as an AUSA and continuing" she was assigned "more cases and/or more high-work cases." Compl. ¶ 13.[8]  This also undermines the notion that the EEO activity in 2020 is the "but for" cause of a situation that had allegedly been ongoing since 2016, *see* Compl. ¶ 70, and the complaint is devoid of allegations that any individuals responsible for the case assignments were aware of the EEO activity.  Therefore, the purely summary allegation in Count IV fails to state a plausible claim that case assignments were retaliatory, and that portion of the count must be dismissed.

---

8       Even though plaintiff asserts in paragraph 24 of her complaint that her disparate case assignment claims "may be viewed" as comprised of "four subperiods," there is no fact alleged that would differentiate the periods other than the dates she has selected.  The management official who was allegedly responsible for case assignments "from plaintiff's first day as an AUSA *until* on or about December 10, 2019, the date of plaintiff's response to the disciplinary proposal" was still responsible for assignments after that date, and a new official became involved as of January 1, 2021.  Compl. ¶ 24 (emphasis added).

Plaintiff also alleges in Count IV that she was subjected to the five-day suspension, and her grievance of that sanction was denied, in retaliation for her December 10, 2019 response to the Disciplinary Proposal, which she characterizes as "protected activity" for purposes of Title VII. Compl. ¶¶ 69, 71.

The first problem with this allegation is that the Disciplinary Proposal called for a ten-day suspension, Disciplinary Proposal at 1, and that sanction was *reduced* to five days after plaintiff submitted her response.   Disciplinary Decision at 2.   This leads one to question whether the decision made after plaintiff's submission can be characterized as "adverse" at all.   Indeed, the contention that the Department of Justice, which was already considering disciplining plaintiff, was so irked by her "protected activity" that it decided to retaliate by reducing her proposed suspension in half and only finding her responsible for one of the two proposed charges is highly illogical.   *See Iqbal*, 556 U.S. at 679 (plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense").

But plaintiff does allege that a disciplinary sanction was in fact imposed, so the Court will not dispense with the claim on that basis alone.

The analysis of any retaliation claim must begin with the predicate question of whether the complaint alleges that plaintiff engaged in protected activity:  does she claim to have opposed any practice made unlawful by Title VII or that she made a charge, testified, assisted, or participated in a Title VII proceeding or investigation prior to the alleged act of retaliation?   *See* 42 U.S.C. § 2000e–3(a).  Plaintiff does not and could not claim that the disciplinary process was a Title VII proceeding in which she participated, but she submits that in her response to the PRMU, she "expressed opposition to a practice made unlawful by Title VII, namely that a high-ranking

agency counsel in a subcomponent of the Department treated plaintiff differently based on her sex."  Compl. ¶ 69.

This does not support a retaliation claim because what Title VII outlaws is discrimination by "an employer," 42 U.S.C. § 2000e–2(a), and plaintiff does not allege the existence of any employment relationship between herself and the agency lawyer.

To understand what plaintiff is talking about, one needs to look at the documents incorporated in this claim.  The PRMU conducted a *de novo* review of the incident under investigation – the filing of a joint report bearing the signature of opposing counsel who had not authorized its filing over her name – and it proposed two charges, lack of candor and conduct unbecoming an AUSA.  Disciplinary Proposal at 6–7.  It then considered whether a penalty would be appropriate in light of the potential aggravating and mitigating factors set forth in *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981).  Disciplinary Proposal at 7–12.  In connection with the tenth factor, "the potential for the employee's rehabilitation," among others, the Proposal referred to the fact that the Associate General Counsel of the Federal Bureau of Investigation had complained to the U.S. Attorney's Office about plaintiff's interactions with FBI personnel on two occasions.  *See* Disciplinary Proposal at 11–12.

Starting on page seventeen of her twenty-six page Response to the Discipline Proposal (sixty-four pages including the attachments), plaintiff took issue with the PMRU Attorney's characterization of her interactions with the FBI, and she attached the email exchanges with the Associate General Counsel that prompted the first complaint as part of Exhibit E to her Response. Pl.'s Resp. at 17–21; 48–61.  This material, referenced in the complaint, reveals that in connection with her representation of the FBI in *Shimiles v. United States*, 19-cv-2044, a civil action in the U.S. District Court for the District of Columbia alleging negligence by an agency employee driving

a motor vehicle, plaintiff communicated with the FBI attorney and paralegal assigned to the matter

on October 9, 2019 concerning a draft answer:



Pl.'s Resp. at 49.



Pl.'s Resp. at 57–58.



Pl.'s Resp. at 57. ███████████████████████████

Pl.'s Resp. at 56. ████████████████████████  Plaintiff responded

with the comment that was quoted in the Disciplinary Proposal:

> Good to know the FBI values its paralegal's time more highly than mine
> with respect to deleting from the FBI's draft answer all of the allegations
> copied from the complaint.

Pl.'s Response at 56; *see also* Disciplinary Proposal at 12 ("I am shocked that you continue to

communicate with disdain, sarcasm, and indignation.  Your response to the FBI Office of General

Counsel attorney . . . is unfathomable.").

Plaintiff submitted a vociferous response to every aspect of the Disciplinary Proposal.  The "protected activity" alleged to be contained in the Response consists of a single paragraph on page nineteen:

> As for the second sentence, "Good to know that the FBI values its paralegal's time more than mine with respect to deleting from the FBI's draft answer all of the allegations copied from the complaint," I was noting that the paralegal could have deleted the allegations he had copied from the complaint, *i.e.*, complied with part of my request.  **I was and am aware that the FBI is "historically a male-dominated law enforcement agency**," *i.e.*, "[w]omen made up only a fifth of the bureau's 13,500 agents as of October, and few women work in the agency's top echelons."  Adam Goldman, *Women Sue F.B.I., Claiming Discrimination at Training Academy*, N.Y. Times, May 29, 2019.  [The Associate General Counsel] apparently cannot see the optics of his informing me, in sum or substance, that a male paralegal's time is more valuable than mine.  **Perhaps [the Associate General Counsel's] reactions to me arise in part from his implicit bias.**

Pl.'s Resp. at 19 (emphasis added).

Since it is clear from the Disciplinary Proposal and plaintiff's Response that the lawyer involved was the Associate General Counsel of the FBI, and that plaintiff, a lawyer in the Civil Division of the U.S. Attorney's office, was interacting with him in her role as the lawyer defending a civil action brought against that agency, complaining about him would not constitute opposing a violation of Title VII, that is, discrimination by an employer.  *See Crawford*, 555 U.S. 271 (2009) ("When an employee communicates to her employer a belief that *the employer* engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity.") (emphasis added) (internal quotation marks omitted).

Moreover, merely observing that the FBI is "historically a male-dominated law enforcement agency," and surmising that "perhaps" one of its in-house lawyers could have been

motivated "in part" by implicit bias hardly rises to the level of "opposing" conduct made illegal by Title VII.

But even if one could view plaintiff's voicing the vague suggestion that agency counsel might have been biased to activity protected by Title VII,[9] another significant problem is that the chronology cannot support a plausible claim that advancing this theory in one paragraph of the lengthy, point-by-point refutation of the PRMU's proposal was the but-for cause of the sanction plaintiff received. By the time plaintiff submitted her response to the proposed discipline and included the observation about the agency lawyer, she had already been investigated by OPR, charges had already been brought, and the PRMU had already recommended sustaining two charges and imposing a ten-day suspension. As the Supreme Court has held, "[e]mployers need not suspend previously planned [actions] upon discovering [protected activity], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001). For these reasons, the portions of Count IV that claim that the suspension and ruling on the grievance were retaliatory must also be dismissed, and that means that the count will be dismissed in its entirety.

## IV.   <u>Count V</u>

Count V asserts that plaintiff "was entitled to a meaningful opportunity to evaluate and respond to the allegations against her before the Department made its purportedly *de novo* decision regarding discipline." Compl. ¶ 74. Plaintiff alleges that defendant "violated plaintiff's rights

---

9       *See Leavitt*, 407 F.3d at 417 (holding that the opposed actions need not actually be unlawful for the opposition activity to be protected; "an employee seeking the protection of the opposition clause must demonstrate a good faith, reasonable belief that the challenged practice violates Title VII.") (internal citation omitted).

under the Fifth Amendment's Due Process Clause by changing the standard that it used to impose discipline, a standard that was not provided in its disciplinary proposal and that appeared for the first time in its disciplinary decision."  Compl. ¶ 75.  Specifically, plaintiff complains that defendant "referenced and applied Federal Circuit and Merit Systems Protection Board caselaw regarding a 'lack of candor' disciplinary charge but that caselaw that was not referenced or cited in the Department's disciplinary proposal."  Compl. ¶ 75.

Defendant moved to dismiss the count on the ground that this Court "lacks subject matter jurisdiction over Plaintiff's due process claim because Plaintiff failed to properly exhaust her administrative remedies," citing the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. §§ 1101 *et seq*.  The CSRA prescribes the "framework for evaluating personnel actions taken against federal employees," and it calls for "graduated procedural protections" that an agency must provide, depending on "an [employment] action's severity." *Kloeckner v. Solis*, 568 U.S. 41, 44 (2012).  The CSRA is "designed to balance the legitimate interests of . . . federal employees with the needs of sound and efficient administration," *United States v. Fausto*, 484 U.S. 439, 445 (1988), and "[g]iven the painstaking detail with which the CSRA sets out the method . . . [of] review of adverse employment actions, it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 11 (2012).

In light of those precedents, the D.C. Circuit has recognized that the "CSRA is comprehensive and exclusive," and that to permit circumvention of the CSRA "would undermine Congress's efforts to foster a unitary and consistent Executive Branch position on matters involving personnel action." *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (internal quotation marks and citations omitted).  Therefore, "federal employees

are ordinarily not permitted to split a challenge to an adverse personnel action between the [CSRA's mandated Merit Systems Protection Board pathway] and a federal district court." *Lacson v. Dep't of Homeland Sec.*, 726 F.3d 170, 174 (D.C. Cir. 2013).

Plaintiff argues that the CSRA does not apply here because she is a member of the excepted service. *See* Pl.'s Opp. at 27. She points to the provision that, in her view, governs this situation: the portion of the CSRA addressing suspensions "for 14 days or less." 5 U.S.C. § 7502. That subchapter states that "[f]or the purpose of this subchapter--(1) "employee" means an individual *in the competitive service*." 5 U.S.C. § 7501 (emphasis added). So she is correct that the procedural protections listed in 5 U.S.C. § 7503(b) for employees facing suspensions of fourteen days or less apply to competitive service employees, rather than excepted service employees like herself.

But that observation has nothing to do with the legal question the Court is being asked to decide. In her complaint, plaintiff has alleged that the Department failed to afford her the procedural protections she was due under the Constitution when it issued the final Disciplinary Decision. And in its motion to dismiss, the defense contends that plaintiff was required to exhaust her administrative remedies before bringing such a claim to court. It notes that under the Merit System established in Chapter 23 of Title 5, plaintiff was an employee serving in a "covered position," which means "any position in the competitive service . . . *or* a position in the excepted service." *See* Def.'s Reply at 19, citing 5 U.S.C. § 2302(a)(2)(B) (emphasis added). And pursuant to that chapter, as another court in this district has explained, it is the CSRA that determines the process that must be followed in a challenge such as this.

> An employee cannot . . . directly challenge more minor adverse employment actions before the MSPB. The CSRA instead provides that, to challenge these less significant "personnel actions," the implementation of which

constitute "prohibited personnel practices," *see* [5 U.S.C. §]§ 2302(a), (b), an employee must file a complaint in the U.S. Office of Special Counsel ("OSC"), *id.* § 1214(a)(1)(A).  OSC then investigates the complaint "to determine whether there are reasonable grounds" to believe a violation of the statute has occurred. *Id.* § 1214(b)(2)(A).  If OSC determines that such grounds exist, it "shall report the determination together with any findings or recommendations" to the MSPB and the agency. *Id.* § 1214(b)(2)(B).  If the agency does not comply with OSC's recommendations or otherwise act, OSC may, but is not required to, petition the MSPB for an order requiring the agency to take corrective action. *Id.* § 1214(b)(2)(C).  Though an employee can appeal an adverse final determination by the MSPB to the Federal Circuit, *see id.* §§ 1214(c), 7703(b), the CSRA does not grant the employee any further administrative or judicial review if OSC declines to petition the MSPB.

Most relevant here, "personnel actions" that fall within OSC's purview include "any . . . significant change[s] in duties, responsibilities, or working conditions." *Id.* § 2302(a)(2)(A)(xii).  **The CSRA enumerates thirteen circumstances under which personnel actions become "prohibited personnel practices," which must be brought before OSC in the first instance.** *Id.* **§ 2302(b).**  One of those thirteen "prohibited personnel practices" occurs when a "personnel action" violates "any law, rule, or regulation implementing, or directly concerning, the merit system principles" listed in the statute. *Id.* § 2302(b)(12).  These principles require, in relevant part, "proper regard for [employees'] constitutional rights." *Id.* § 2301(b)(2).  **Consequently, personnel actions that implicate violations of constitutional rights . . . are therefore prohibited personnel practices that generally fall within the CSRA's exclusive remedial scheme.**

*Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 363 (D.D.C. 2020) (emphasis added), *appeal dismissed*, No. 20-5374, 2021 WL 2201669 (D.C. Cir. May 17, 2021).  The Court finds this interpretation of the CSRA to be instructive and persuasive.

Plaintiff has not pled that she has started this process, let alone completed it, and until she does so, the proper venue for her constitutional claim lies elsewhere.  The Court does not have jurisdiction over Count V and it will be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

**CONCLUSION**

The Court will **GRANT** defendant's motion to dismiss, making the motion for summary

judgment and plaintiff's motion for discovery moot.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  April 21, 2022